**C–LINE, INC.,**
and
**American Institute for Shippers' Association, Inc., Plaintiffs,**
v.
**UNITED STATES of America**
and
**Interstate Commerce Commission, Defendants.**

**Civ. A. No. 4965.**

United States District Court,
D. Rhode Island.

May 22, 1974.

Ronald N. Cobert, of Grove, Jaskiewicz & Gilliam, Washington, D. C., George M. Vetter, Jr., of Hinckley, Allen, Salisbury & Parsons, Providence, R. I., for plaintiffs C-Line, Inc. and American Institute for Shippers' Assn.

Wm. P. Sullivan and Robert M. Sielaty, of Todd, Dillon & Sullivan, Washington, D. C., William F. McMahon, of McMahon & McMahon, Providence, R. I., for intervening plaintiff Contract Carrier Conference of American Trucking Assns., Inc.

John H. D. Wigger, U. S. Dept. of Justice, Washington, D. C., Lincoln C. Almond, U. S. Atty., Providence, R. I., for defendants United States and Interstate Commerce Commission.

Joseph R. DeStefano, East Providence, R. I., Adolph N. Anderson, Jr., Providence, R. I., Ronald B. Natalie, of Verner, Liipfert, Bernhard & McPherson, Washington, D. C., for intervening defendants.

### OPINION

Before McENTEE, Circuit Judge, PETTINE, Chief Judge and DAY, District Judge.

DAY, District Judge.

In this action the plaintiffs seek to enjoin, annul and set aside orders of the Interstate Commerce Commission (hereinafter "Commission") holding that the proposed activities of the plaintiff C-Line, Inc. did not qualify as that of a "contract carrier by motor vehicle"

within the provisions of 49 U.S.C. § 303(a)(15) and, further, that its proposed operations did not merit the issuance of a certificate of public necessity and convenience which is a prerequisite to performance as a common carrier by motor vehicle under 49 U.S.C. § 306.

The jurisdiction of this Court is invoked by the plaintiffs under the provisions of 28 U.S.C. §§ 1336, 1398, 2322, 2323 and 2325. After the filing of the plaintiffs' complaint, a three-judge Court was duly designated, pursuant to 28 U.S.C. § 2284, to hear and determine the merits of this action as required by 28 U.S.C. § 2325. By orders of this Court, the Contract Carrier Conference of American Trucking Associations, Inc. was allowed to intervene as a plaintiff, and Regular Common Carrier Conference of American Trucking Associations, Inc.; Carolina Freight Carriers Corp.; Johnson Motor Lines, Inc.; Holmes Transportation Corp., Inc.; Pilot Freight Carriers, Inc.; St. Johnsbury Trucking Co., Inc.; Navajo Freight Lines, Inc.; and T.I.M.E.—D.C. Inc. were permitted to intervene as defendants and to file briefs.

A detailed statement of the facts of this case can be found in the Report and Recommended Order of the Hearing Examiner, which statement was adopted in substantial part by the Commission. By its application, filed with said Commission on January 26, 1970, under the provisions of 49 U.S.C. § 309(a) and (b) and the Commission Rules thereunder, C-Line, Inc. sought authority to operate as a contract carrier by motor vehicle over irregular routes in the transportation of commodities of unusual value in mixed loads with other general commodities from Providence, Rhode Island to points in California, Connecticut, Georgia, Illinois, New Jersey, New York, Ohio, Michigan and Texas, and from points in New York, New Jersey and Connecticut to Providence. Its application is supported by Jewelers Shipping Association ("J.S.A."), a non-stock corporation, which is a non-profit association of shippers, based in Providence,

Rhode Island. J.S.A. assembles and distributes the freight of its members, but is exempt from regulation as a freight forwarder under Part IV of the Interstate Commerce Act by virtue of the provisions of 49 U.S.C. § 1002(c) which provides:

> "The provisions of this chapter shall not be construed to apply (1) to the operations of a shipper or a group or association of shippers, in consolidating or distributing freight for themselves or for the members thereof, on a nonprofit basis, for the purpose of securing the benefits of carload, truck load, or other volume rates, . . . ."

The ostensible raison d'etre of J.S.A. is the expeditious and economical transportation of jewelry and related products. It presently advances that objective through the consolidated shipment of such products with general commodities by railroad with common motor carrier pick-ups and deliveries. J.S.A. seeks improved service by the utilization of a contract motor carrier for the transportation of said mixed loads.

Membership in said J.S.A. is attained by approval of its board of directors which is empowered to grant membership, upon the payment of nominal dues, to any shipper whose general commodity traffic is determined to be beneficial to the goal of commercial transportation of jewelry products. At the time of the hearing before said Examiner, the membership of J.S.A. consisted of six hundred and thirty-two (632) shippers, sixty (60) of whom had joined said association in the preceding year. Twenty-six (26) of its members were engaged in activities unrelated to the jewelry industry.

During the year prior to the hearing on said application, said J.S.A. made shipments of twenty-three (23) commodities classified as jewelry and of forty-four (44) non jewelry items. During March, 1970, 60.7 per cent of the shipments by weight consisted of traffic from members of J.S.A. who were not related to the jewelry industry.

Following hearings in August and September 1970, said Examiner concluded that C-Line, Inc. qualified as a contract carrier by motor vehicle as that term is defined in 49 U.S.C. § 303(a)(15) which provides:

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation . . . under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

More specifically said Examiner concluded that said proposed contract would be with "one person" since—

"(J.S.A.) alone will pay the transportation charges incurred in its members' behalf under the proposal, even as it does now, and as their agent it will route the traffic of its members, whether by applicant, or by a rail or motor carrier, just as it does now." Examiner's Report at page 12.

The protection of high value shipments proposed by C-Line, Inc. consisting of locked wire cages, alarm systems and daily driver check-ins was held by him to satisfy the test of 49 U.S.C. § 303(a)(15) by meeting a distinct need of the shipper. He held this dedication of equipment fulfilled the alternative test of 49 U.S.C. § 303(a)(15), (b).

The proposed services of the applicant were then evaluated by said Examiner in the terms of the public interest and rational transportation policy pursuant to the guide-lines set forth in 49 U.S.C. § 309(b).[1] He concluded that the grant of said application of C-Line, Inc. would subject seven (7) of the nine (9) protesting carriers to significant diversions of general commodities traffic upon which they were dependent to sustain their operations in the Providence area. However, he also concluded that C-Line, Inc. would be able to provide J.S.A. with house carrier responsibility which it then lacked. In his report he recommended that an order be entered by the Commission granting authority to C-Line, Inc. for the operation by it as a contract carrier by motor vehicle, of precious jewelry and related items, along irregular routes between the destination points set forth in its application for such authority.

Exceptions were promptly filed to said order recommended by the Examiner by certain protestants, associations and conferences. After a consideration of the evidence, the Examiner's decision and the briefs of the parties, the Commission, on November 2, 1971, rejected the recommendation of said Examiner on the ground of the failure of the applicant to meet the prerequisite of a proposed contract for carriage with "one person or a limited number of persons". Since an association of shippers in order to be exempt from regulation as a freight forwarder under Part IV of the Interstate Commerce Act, must be effectually controlled by its members, the Commission determined that J.S.A. is the "alter ego" of its membership and that the shippers were actually the 632 members thereof. These members were found not to constitute "one person or a limited number of persons". The proposed services of C-Line, Inc. were therefore evaluated by said Commission as those of a common carrier. Public

[1]. 49 U.S.C. § 309(b) provides, in pertinent part, as follows:

"In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in the Act, the Commission shall consider the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carriers, and the effect which denying the permit would have upon the applicant and/or its shipper and the changing character of that shipper's requirements."

convenience and necessity were found not to warrant the grant of motor common carrier authority to C-Line, Inc. on the grounds that there was little evidence that J.S.A. shipped to jewelers in the destination territory and no evidence that it would in the future; that its past shipments to some of the states in said territory had consisted of general commodities rather than jewelry, and that J.S.A. had not made a "real attempt" to obtain services similar to those proposed by the applicant from existing common carriers. 114 M.C.C. 226, 233 (1971).

Plaintiff C-Line, Inc. subsequently petitioned for reconsideration and oral argument. Its petition was denied by the Commission on March 30, 1972. Subsequently C-Line, Inc. filed a petition wherein it sought a finding that an issue of general transportation was involved. Said petition was denied on May 15, 1972, and thereafter the plaintiffs filed the instant action.

In their complaint the plaintiffs allege that said decision of the Commission is based upon a misinterpretation of law, is contrary to the only evidence of record, is arbitrary, capricious and clearly erroneous and contrary to the scope of the statutory authority of said Commission.

The thrust of the plaintiffs' argument for reversal of the decision by the Commission is that J.S.A. is "one person" as the term "person" is defined in the definitional section of Part II of the Interstate Commerce Act; Motor Carriers, Section 303(a)(1) of 49 U.S.C. which provides as follows:

> "(a) As used in this chapter—(1) The term "person" means any individual, firm, copartnership, *corporation,* company, *association,* or joint-stock association; and includes any trustee, receiver, assignee, or personal representative thereof." (emphasis added).

By ignoring this definition, plaintiffs claim the Commission acted beyond the province of its statutory authority. After extensive oral arguments by counsel for the parties the Court reserved decision.

■ It is well settled that the scope of judicial review of an order of the Commission is limited. Such an order will be sustained if it is within the Commission's power, and its judgment is rational and based upon substantial evidence. Illinois Central Railroad Co. et al. v. Norfolk & Western Railway Co. et al., 385 U.S. 57, 69, 87 S.Ct. 255, 17 L. Ed.2d 162 (1966); Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Bradley v. Weinberger, Secretary of Health, Education and Welfare et al., 483 F.2d 410 (1st Cir. 1973); Short Line, Inc. v. United States, 290 F.Supp. 939 (D.C.R.I.1968).

The question of whether strict adherence to said definition of "person" is mandated under the provisions of said section 303(a)(15) is an issue of novel impression, and a review of its legislative history has been undertaken in order to analyze the meaning and import of the language utilized in said section.

■■ The general principle of legislative construction is that statutory definitions control the meaning of words. *See* Lawson v. Suwannee Fruit & Steamship Co., 336 U.S. 198, 69 S.Ct. 503, 93 L.Ed. 611 (1949). An exception to this rule arises when a mechanical application of the statutory definition creates obvious incongruities in the language of and destroys a major purpose of the statute. *Id.* When the application of the literal words would bring about a result inconsistent with the purpose of the statute, the judiciary may look to the legislative history to reach a conclusion. United States v. Public Utilities Comm'n of California, 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020 (1954); Johansen v. United States, 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051 (1952); International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 72 S.C. 235, 96 L.Ed. 275 (1951); Feres v. United States, 340 U.S. 135, 71

S.Ct. 153, 95 L.Ed. 152 (1950); Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907).

The Court has reviewed the legislative history of the motor carrier provisions of the Interstate Commerce Act, and more particularly, the history of the present section 303(a)(15) of Title 49 of the United States Code and its predecessors. Included, *inter alia*, in this review were the original reports of the Federal Coordinator of Transportation in 1934 *vis a vis* the proposed Motor Carrier Act, the development of the administrative and judicial interpretation given said section and the subsequent drafts and debates which preceded the 1957 Amendment of said section in response to the decision of the Supreme Court in United States v. Contract Steel Carriers, 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482 (1956), construing said section.

■ The legislative history of the 1957 Amendment clearly indicates that the statutory intent was to give the Commission broad discretion to determine whether a carrier proposes to supply transportation services for "a limited number of persons". The delegation of this authority to the Commission was intended to allow the Commission to evaluate the entire factual situation with the implicit purpose of ascertaining what operations, in the terms of the number of shippers, are in fact duplicative and characteristic of the services which are rendered by common carriers. Given this very liberal grant of power, we conclude that the Congress by the use of the word "person" in the 1957 Amendment of said section 303(a)(15) did not intend to restrict the Commission in a determination of when and under what circumstances a legal entity, which does carry out shipping functions, is a "person" within the context of said section 303(a)(15). We conclude that the Commission is not prohibited from determining when an association or corporation is a person within the meaning of said section.

■ An administrative order within the statutory grant of power to an Agency may properly be set aside only if such order is arbitrary and irresponsible. N.L.R.B. v. Williams, 195 F.2d 669 (4th Cir. 1952), cert. denied, 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649 (1952), or if it is not based upon adequate findings which are supported by substantive evidence. J. B. Montgomery, Inc. v. United States, 206 F.Supp. 455 (D.Colo.1962), aff'd 376 U.S. 389, 84 S.Ct. 884, 11 L. Ed.2d 797 (1964). An administrative order predicated on a statutory base is not reviewable as to the wisdom or good judgment of an Agency in exercising its discretion. Hargett v. Summerfield, 100 U.S.App.D.C. 85, 243 F.2d 29 (1957) cert. denied, 353 U.S. 970, 77 S.Ct. 1060, 1 L.Ed.2d 1137 (1957). *See generally*, Bradley v. Weinberger, supra.

■ The plaintiffs implicitly contend that the Commission's ruling that J.S.A. is not a "person" is arbitrary and unreasonable by its assertion that its decision is in conflict with prior decisions of the Commission. In support of this contention, plaintiffs rely upon the decisions by said Commission in Dale D. Jacobs Extension Frozen Foods, 96 M.C.C. 87 (1967) where it was determined that a public warehouseman of frozen foods, which exhibited indicia of control of shipping was the "shipper" and Commerce Consultants Corporation Contract Carrier Application, 103 M.C.C. 725 (1967), where it was held that an independent entrepreneur which was a market support distribution facility for forty-nine (49) manufacturers, which likewise exhibited indicia of control, was the "shipper". The plaintiffs argue that similar shipping functions are performed by J.S.A.

The record discloses that the Commission did not base its decision on the lack of shipping functions by J.S.A. It appears to concede their existence. The distinction made by the Commission rests upon the relationship existing between J.S.A. and its members as indicated by the following statement in the Report of the Commission.

"But the circumstances that prevailed in the *Jacobs* and *Commerce Consultants* cases are substantially different in a crucial respect from those that exist here. In those cases there was more than merely a technical separation between the manufacturers or owners of the goods and the contracting shippers. There, the businesses of the shippers and the manufacturers were actually as well as legally separate and the shippers controlled the transportation. Here, except for the technical fact of incorporation there is no distinction between the association and its membership. . . . Indeed a shipper's association whose members do not control the movement of their freight is not lawfully engaged in exempt operations." C-line Extension—Precious Jewelry, 114 M.C.C. 226, 231 (1971).

There is a well defined relationship between an exempt shipper's association and its members, which is characterized by the control of the membership over the transportation activities of the association. Such a fact does distinguish this case from the Jacobs and Commerce Consultants cases. Prior decisions of the Commission had, nevertheless, not focused on the internal organization of the shipper. The decision of the Commission in this case may therefore be said to evince a classification or modification of prior policy, at least insofar as it pertains to associations of shippers.

■ An agency is not prohibited from so changing its policies. New Castle County Airport Commission v. C.A. B., 125 U.S.App.D.C. 268, 371 F.2d 733 (1966), cert. den. 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967); City of Chicago v. Federal Power Commission, 128 U.S.App.D.C. 107, 385 F.2d 629 (1967), cert. den. 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968); Greater Boston Television Corporation v. F.C.C., 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. den. 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701; reh. den. sub nom. WHDH, Inc. v. Federal Communications et al., 404 U.S. 877, 92 S.Ct. 30, 30 L.Ed.2d 125, cert. den., 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). Indeed, it is a positive attribute of administrative processes that policies are reformulated in the light of experience and changing conditions rather than petrified in an inflexible and stagnant mold. The need for flexibility in administrative action, of course, does not justify or warrant arbitrary action.

The standard for a change in administrative policy was succinctly expressed by the Court in New Castle County Airport Commission v. C.A.B., supra, at 734–735 as follows:

"When not controlled by a regulation, even an established approach or precedent may be modified or overruled. . . . An agency reversing its course should supply an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the need for adherence to standards."

At the time the Commission rendered its decision in this case, there was in effect an administrative ruling which required that the contract of a contract carrier by motor vehicle must be with the "shipper" and defined the "shipper" as

"the person who controls the transportation and refers to the actual shipper rather than an intermediary. Such shipper may be nominally either the consignor or consignee, but must be one or the other. The payment of the charges for the transportation is evidence that the person who pays is the person who controls the transportation and such person will be presumed to be the shipper. Accordingly, the contract must be between the carrier and the party who pays the carrier's transportation charges, who must be the consignor or consignee. The contract carrier may not transport property for shippers other than the shipper with whom he has a contract." Interstate Commerce Commission, Administrative Ruling No. 76 (1939) (See 37 F.R. 24036, Nov. 11, 1972).

■ However, this ruling had not been published and since it was not an official regulation of the Commission it was not binding upon C-Line, Inc. *See* Thomas v. County Office Committee of Cameron County, 327 F.Supp. 1244 (S.D.Texas 1971); Wyman-Gordon Company v. N.L.R.B., 397 F.2d 394 (1st Cir. 1968), rev'd on other grounds, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). If said ruling had been published in the Federal Register as a regulation, such regulation would have the force of law and the Commission would be bound thereby as would the general public. Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); Mississippi Valley Barge Line Co. v. United States, 252 F.Supp. 162 (E.D.Mo.1966), dismissed sub-nom. Pittsburg Towing Co. v. Mississippi Valley Barge Co., 385 U.S. 32, 87 S.Ct. 195, 17 L.Ed.2d 31, reh. den. 385 U.S. 995, 87 S.Ct. 594, 17 L.Ed.2d 455 (1966). As an unpublished ruling, said Administrative Policy No. 76 is properly regarded as akin to a policy established by administrative decisional precedent and is thus subject to clarification or change by administrative decision, as long as the subsequent decision explicates the basis for its ruling.

■ The Commission in this case explained the distinction between the facts therein and those in *Jacobs* and *Commerce Consultants, Inc.* In City of Lawrence, Massachusetts v. C. A. B., 343 F.2d 583 (1st Cir. 1965), the Court of Appeals reversed an agency decision in part because the agency had departed from its prior decisions without explanation. In the instant case, the Commission did adequately explain the rationale of its decision and distinguished it from earlier decisions. Although the plaintiffs have generally challenged the validity of the orders of said Commission in their complaint, they have neither specifically raised nor briefed the issue of whether the Commission correctly determined that the members of J.S.A. do not constitute a "limited number of persons". In the absence of briefing such ground, if intended to be raised, it shall be deemed to be abandoned. Kansas City Railway Co. v. United States, 288 F.Supp. 742 (W.D.Mo.1968); Riss & Co. v. United States, 96 F.Supp. 452 (W.D.Mo.1950); rev'd on other grounds, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345 (1951).

The plaintiffs do make a twofold attack on the Commission's denial of a certificate of public convenience and necessity. They accuse the Commission of a "once over lightly" approach because of its failure to discuss eleven "salient" facts, and, in part, as a result thereof, they assert that said Commission has violated the National Transportation Policy.[2]

■ There is no requirement that the Commission must in its report discuss all the issues and facts disclosed by the record. The Commission is only obligated to file a report, stating its conclusions with a recital of the "basic" or "quasi-jurisdictional" findings essen-

2. The National Transportation Policy as enacted by Congress, 49 U.S.C. preced. § 301, is as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act . . ., so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discrimi-

nations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

tial to the statutory validity of an order. Alabama G.S.R. Co. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951). Detailed fact finding is only required in a case in which damages are awarded. *Id.* The National Transportation Policy must, of course, serve as a guiding light in all of the Commission's decisions. Luckenbach S.S. Co. v. United States, 122 F.Supp. 824 (S.D.N.Y. 1954), aff'd 347 U.S. 984, 74 S.Ct. 850, 98 L.Ed. 1120 (1954). However, it is not a requisite that every factor in such policy be discussed and evaluated; it is only necessary "that the essential basis of the Commission's order appear in the report so that a court can satisfy itself that the Commission has performed its function". 122 F.Supp. at 828.

The Commission made several findings in support of its decision to deny C-Line, Inc. a certificate of public convenience and necessity. It found that even as to points in Illinois, Texas, and California to which J.S.A. presently ships, the great bulk of said shipments consists of general commodities rather than jewelry or related products. It further found that there is little evidence in the record that J.S.A. has shipped, or ever will ship to jewelry dealers located throughout the destination area. It concluded that J.S.A. had made no "real attempt" to obtain from existing common carriers service of the type proposed. Finally, the Commission disbelieved the assertion of J.S.A. that it did not use common carriers because of the unavailability of full coverage insurance. It noted that many of the protestants presently perform service for members of J.S.A., and that motor common carrier service is now used by J. S.A. at each end of the line-haul rail transportation that it now uses and that it intends to continue to use motor common carrier service for pick-ups and deliveries if the application of C-Line, Inc. were granted.

The more relevant of the salient facts recited by the plaintiffs as omitted pertain to the improved and more economical services which C-Line, Inc. would be able to render J.S.A. The Court also notices that the Commission likewise omitted an evaluation of the harm which would be sustained by the protesting carriers if C-Line, Inc. were granted authority to operate as a common carrier. Said Commission foreclosed any analysis in which said factors would be balanced by its finding that J.S.A. has made no "real attempt" to get similar services from existing common carriers and by its further conclusion that—

> ". . . ordinarily, existing carriers are entitled to all of the traffic that they can handle reasonably expeditiously under their outstanding authorities." 114 M.C.C. 226, 233.

The scope of review of the criteria utilized by the Commission is limited to a determination whether they are arbitrary or capricious, United Van Lines, Inc. v. United States, 266 F.Supp. 586 (E.D.Mo.1967) or in conflict with the National Transportation Policy. Schaffer Transp. Co. v. United States, 355 U. S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957); Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646 (D.N.H. 1964).

The Supreme Court has rejected the theory that there is a "rule of property" in favor of existing common carriers which would prohibit the issuance of a certificate to a carrier without affording existing carriers an opportunity to rectify differences in their services. United States v. Dixie Express, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967). The Supreme Court held at page 411:

> ". . . upon the basis of appropriate findings, the 'Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service'."

The converse must also be true; that in appropriate circumstances the commission may allow existing carriers the opportunity to furnish the services in question.

The problem in this case is that the Commission has not clearly delineated the circumstances which dictated its conclusion that said existing common carriers should be afforded the opportunity to provide the proposed services.

In Nashua Motor Express, Inc. v. United States, supra, 230 F.Supp. at 252, the three judge District Court listed as elements of importance in the evaluation of public necessity and commerce the adequacy of services, the desirability of competition, the desirability of different kinds of service, and the desirability of improved service. The case was remanded to the Commission because a certificate of public convenience was denied solely on the basis of adequacy of existing service.

The issue before this Court is similar. Stated simply,—how much muteness is tolerable in view of the very broad grant of discretion which has been vested in the Commission?

Two Courts have approached this problem by an analysis of the record before the Commission. A three-judge District Court in Town of Montague v. United States, 306 F.Supp. 1227 (D. Mass.1969) has interpreted Nashua Motor Express, Inc., supra, as merely holding that—

"the absence of a finding of inadequate service is not enough to bar a certificate when other factors justify a finding of public convenience and necessity." 306 F.Supp. 1229.

The Court did not find any such "other factors" present in the case before it which involved the issue of whether the Commission, having made a finding of some public convenience, was bound to make a finding as to whether the grant of authority would be unduly prejudicial to a protestant. The Court concluded that the Commission did not have such a burden.

In Feature Film Service, Inc. v. United States, 349 F.Supp. 191 (S.D.Ind. 1972), the Court was faced with a factual situation almost identical to that in this case. The Commission had adopted the Examiner's decision which succinctly recited that the case fell within the category of cases—

". . . wherein the Commission has found that existing carriers should 'be allowed to transport all of the traffic which they can handle adequately, economically, and efficiently to and from the points they serve without the added competition of a new service . . . .'" Id. at 201. On the basis of an examination of the record and of the specific findings of the Examiner, the Court concluded that the "Nashua" factors had been evaluated.

Similarly, we are persuaded that the "Nashua" factors were considered by the Commission in the instant case. The findings of fact of the Examiner adopted by the Commission included findings that many of the protesting carriers performed transportation services for individual members of J.S.A. Necessarily a grant of authority to C-Line, Inc. would divert some of that traffic. Moreover, the Commission found that only a relatively small portion of the shipments made to current shipping points by J.S.A. constituted jewelry, the bulk of said shipments being general commodities, and that there was no evidence as to present or future shipments by J.S.A. to other areas in the destination territory. Since the avowed purpose of J.S.A. is the economical and efficient transportation of jewelry, such an evidentiary finding negates the existence of "strong" public convenience and necessity. The finding by said Commission that J.S.A. had not made any "real attempt" to obtain the proposed services from existing common carriers buttresses the finding by the Commission of the absence of public convenience and necessity. Implicit in the decision of the Commission to deny said certificate is its finding that such considerations outweighed any showing of improved services demonstrated by the applicant.

The proposed services cannot be said to outweigh the other factors on the ba-

sis of the record in this case. Without reviewing the details of the voluminous record herein, we find that the subordinate findings of the Commission on which its decision is based are supported by the substantial weight of the evidence. In our opinion, the decision of the Commission was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

Accordingly, said orders of the Commission must be and are affirmed and judgment will be entered in favor of the defendants.